# WILLIAM WILLIAMS AND OTHERS, APPELLANTS,
## *v.*
# GEORGE ARMROYD AND OTHERS, APPELLEES.

1813.

Feb. 25th.

---

*Absent,* TODD, J.

THIS was an appeal from the sentence of the Circuit Court for the district of Pennsylvania, which dismissed the libel with costs.

*[margin:* STARK *v.* CHESA-PEAKE INS. CO. *]*

*[margin:* A sentence of a foreign tribunal condemning neu-*]*

WILLIAMS & OTHERS v. ARMROYD & OTHERS.

The libel stated, that the schooner *Fortitude*, owned by Williams and others, citizens of the United States, having taken in a cargo of molasses at Martinico, sailed on the 20th of August, 1809, for New London. That on the next day she was piratically seized on the high seas by an armed schooner, shewing no colours, but asserted to be from *Guadaloupe*, and carried into *St. Martin's*, where the captain's papers were taken from him, and the vessel and cargo detained, as it was asserted, to wait the event of a trial. That on the 9th of September, the prize-master left St. Martin's for Guadaloupe, with a copy of the schooner's papers, under pretence of causing proceedings to be instituted in the French Court of Admiralty in that island. That on the 23d of September, the master of the Fortitude went to *St. Bartholomews*, and on his return was informed, that during his absence the Governor had ordered the vessel and cargo to be sold at public sale; which was done and bought for the Governor and one of his council, as the Libellants believed. That immediately after the sale, the Governor took possession of the vessel, and on the 2d of October the cargo was landed, and 97 hogsheads of the molasses were shipped on board another vessel to Philadelphia, where they arrived, consigned to Armroyd and others, of whom the Libellants demanded it, but they refused to deliver it, or to account for the value of it.

A claim was interposed by George Armroyd & Co. in behalf of *Richardson & Carty*, and others, which stated,—that on the 21st of August, 1809, and long before, war existed between Great Britain and France; that the Fortitude, being an American vessel at peace with the French empire, on her voyage from Martinico, a British colony, where she had been trading with the enemies of the French empire, during the war, in violation of the decrees and regulations of that empire, was seized by a French privateer, and carried to St. Martin's, as lawful prize to the captors; and her papers sent to a French tribunal, having competent jurisdiction, at Guadaloupe, under the sole and exclusive dominion and jurisdiction of the French empire; but the papers were captured on the passage to Guadaloupe. That the vessel and cargo, being so carried into St. Martin's, were there *bona fide* sold by order of the Dutch

tral property under an edict unjust in itself, contrary to the law of nations, and in violation of neutral rights; and which has been so declared by the legislative and executive departments of the government of the United States; changes the property of the thing condemned A sale by the authority of the captors before sentence of condemnation, is affirmed by such sentence, and is good ab initio.

A French tribunal at Guadaloupe had jurisdiction of property seized on the high seas for breach of the Milan decree, and carried into the Dutch part of the island of St. Martins, and there sold by order of the Dutch governor of St. Martins, before condemnation, without any authority from the French tribunal

governor at the island, to whom such right belonged, by the laws and constitutions of the said island; and the goods in question, part of the cargo, were *bona fide* purchased by a certain *I. L. Lapierre*, and by him *bona fide* sold to a certain *Abraham Concheyter*, from whom they were afterwards *bona fide* purchased by *Richards & Carty*, for account of themselves and others.

By consent of parties, a sentence was passed *pro formâ* in the District Court, for the Libellants.

In the Circuit Court, upon the appeal, the Claimants exhibited a further answer, stating, that by a decree of the Registry of the Commission for prize causes of the island of Guadaloupe, and its dependencies, duly constituted a Court of Prize by the Emperor of France, on the 12th of October, 1809, the schooner *Fortitude*, and her cargo, were condemned, by a sentence which is set forth at large in the answer; the substance of which sentence is included in the following extract, viz.

"It results from the examination and from the analysis of the papers just mentioned, that the schooner Fortitude, captured by the French privateer, *Le Fripon*, is the property of a citizen of the United States of America; that she sailed from New London, bound to Martinico, at which place she sold her cargo, and took in another of molasses for the said port of New London, and consequently she has incurred the penalty, pronounced by the 3d article of the Imperial decree, which directs new measures against the maritime system of England, and was given at the Royal Palace of *Milan*, on the 17th of *September*, 1807, inserted in the bulletin of the laws, No. 169, which article is as follows:

"Every vessel whatever, and whatever be her cargo, which shall have cleared from any English port, colony, or country occupied by English troops, or which shall be bound to any English port, colony or country occupied by English troops, shall be good prize, as having infringed the present decree. Such vessels shall be captured by our men of war, and awarded to the captors."

*Marginal note:* WILLIAMS & OTHERS *v.* ARMROYD & OTHERS.

nal at Guadaloupe. The American owner cannot reclaim, in the Courts of this country, his property which has been seized and condemned in a French court under the Milan decree.

WILLIAMS &. OTHERS *v.* ARMROYD & OTHERS.

" And after having heard the opinion of the inspector " of marine, we have declared, and do declare, the " American schooner Fortitude *to have been well,* and " duly captured by the French privateer, *Le Fripon,* " and to be forfeited to the owners and crew of the said " privateer ; consequently the said schooner Fortitude, " together with her cargo, is awarded to the captors to " be sold in the customary form, if the sale has not al- " ready taken place ; and the proceeds shall be distri- " buted conformably to the ordinance concerning cap- " tures," &c.

On the 19th of April, 1811, the Circuit Court reversed the sentence of the District Court, with costs ; from which sentence of reversal, the Libellants appealed to this Court.

LYMAN LAW, *for the Appellants.*

This condemnation was founded upon the *Milan decree,* which is admitted, on its face, to be in violation of the law of nations. It does not proceed on the ground of its being the property of an enemy, nor contraband of war, nor for violating a blockade. If it appear from the sentence itself, that the condemnation was not upon any ground recognized by the law of nations, nor upon the violation of any municipal right acknowledged by that law, this Court will not carry it into effect. France may, by her own municipal laws, regulate her own trade, but she has no right to control ours, beyond her territorial jurisdiction, further than to protect her own belligerent rights, acknowledged by the law of nations. If we violate no such right, and if we do not carry our property within her territorial jurisdiction, she has no right to regulate our trade. Her condemnation, grounded upon regulations which she has no right, according to the law of nations, to make, is void. But even if she had a right to condemn, her condemnation can transfer no title, unless the thing itself be in her possession, at the time of condemnation, so that the possession may pass with the title. Here the property never was within the jurisdiction of the Court at Guadalope. It had been sold and delivered by the Dutch governor, before the condemnation. It does not appear that he had any authority either from the captors, or from the Court, to make the sale. The purchaser can-

not derive from the governor a better title, than the go- WILLIAMS
vernor had at the time of sale.    & OTHERS

*v.*

**I. R. INGERSOLL,** *contra.*    ARMROŸD
& OTHERS.

It is acknowledged that a tribunal, professing to be
a Court of Admiralty, has condemned the property in
question, and that the Appellees possess it by virtue of
a capture on the high seas. This is *prima facie* evi-
dence of the correctness of the title, and throws the
*onus probandi* upon the Appellants.

A Court of Admiralty is a Court whose jurisdiction is
co-ordinate with that of every other throughout the world.
The Admiralty law is *" of all times and of all nations,"*
and its decrees, so far as they affect the thing itself, and so
long as they remain unreversed, can never be question-
ed. The *end* being gained, it is an immaterial question,
what were the *means,* as they are sanctified by the end.
Whether the proceedings are erroneous, or not, accord-
ing to our notions of right and wrong, whether they
are predicated upon a mistake of the *law,* or of *the fact,*
or are founded upon regulations consistent with, or re-
pugnant to, the law of nations, are questions wholly
immaterial. The sentence has sealed the proceedings,
and those questions can never judicially come before this
Court.

In confirmation of these positions, it might be suffi-
cient to refer to the decisions of this Court, where the
principles are settled.

In the case of *Rose v. Himely,* 4 *Cr.* 292, this Court
refused to confirm the property of the alleged purcha-
ser, because the Court, passing sentence, had neither
the actual nor constructive jurisdiction, nor power, over
the subject in controversy. The point upon which it was
decided was, that the vessel and cargo were seized, out of
the territorial jurisdiction claimed by the French go-
vernment of St. Domingo, for a breach of municipal
regulations, and were never carried within that juris-
diction, but were sold by the captor at a foreign port.

Two Judges, (the Chief Justice and Judge Washing-
ton) thought that, in order to give jurisdiction, the pro-

WILLIAMS & OTHERS v. ARMROYD & OTHERS.

perty should have been taken as prize of war, and brought *infra præsidia.* Three (Judges Cushing, Chase and Livingston) were of opinion, that it would be conclusive even under a municipal regulation, provided it were carried to the country of the captors. Judge Johnson considered it conclusive at all events. But even in that case, the Chief Justice says, in p. 276, "If the "Court of St. Domingo had jurisdiction, the sentence "is conclusive." In the case of *Hudson and others v. Guestier,* and *La Font v. Bigelow,* 4 *Cr.* 293, it is decided that, in case of prize of war, a condemnation, while lying in a *neutral port,* will bind the property; an. that the same principle applies to a seizure made within the territory of a state, for a violation of its *municipal laws,* p. 296. Judges Chase and Livingston dissented, because the vessel was not carried into a French port for trial. Judge Johnson adhered to his former opinion, that it was immaterial whether the capture was made in the exercise of *municipal* or *belligerent* rights, or whether within the jurisdictional limits of France, where she is supreme, or upon the high seas, where her authority is concurrent with that of other nations. P. 298,

In the case of *Croudson and others, v. Leonard,* 4 *Cr.* 434, it was decided, that a sentence of condemnation for breach of blockade, was conclusive evidence of a violation of the warranty of neutrality in a policy of insurance.

In the case of *Rose & Himely,* above mentioned, the incidental questions were decided in favor of our positions; for here it was *prize of war,* seized and condemned within the jurisdiction of the Court; yet it may be said the issue of that case was adverse. If so, it was expressly over-ruled in *Hudson & Smith, v. Guestier,* 6 *Cr.* 281. The Court there unanimously decided, that the judge of the French Court must have had a right to dispose of every question made in behalf of the owner of the property, whether it related to the jurisdiction of the Court, or arose out of the law of nations, or out of the French decrees, or in any other way: and even if the reasons of his judgment should not be satisfactory, it would be no ground for a foreign Court to rescind his proceedings, and to refuse to consider his sentence as conclusive on the property; and that, as the title was changed by the condemnation at Guadaloupe, the original

owner had no right to pursue it in the hands of a vendee.

But this is no new principle of law originating with the present state of the world, which would seem rather to forbid it; since the rapacity of Courts of admiralty on the one side, and their acknowledged subserviency to the governing power on the other, diminish the respect which would otherwise be due to their sentences.

The conclusive effect of a foreign sentence in changing the property seems to have been first judicially decided in the case of *Hughes v. Cornelius*, 2 *Shower*, 242. *Sir T. Raymond*, 473. *Skin.* 59. *Lord Raym.* 893. 935. *Vern.* 21. The authority of this case has never been questioned. The only question has been as to the collateral effect between underwriters and the assured in cases of warranty in a policy of insurance. And even there, whenever the condemnation has been upon the ground of its being the property of an enemy, the sentence has always been holden to be conclusive, without regard to the circumstances by which the Court came to that result. The sentence is conclusive as to whatever it purports to decide. *Park.* 355. 360, 361-2, *Rob.* 173, *The Christopher.* 4 *Rob.* 35, *The Henrick and Maria.* 5 *Rob.* 255, *The Comet.* 4 *Rob.* 3, *The Helena.* 3 *Bos. & Pul.* 505, *Lothian v. Henderson*, 7 *T. R.* 526, *Calvert v. Boville*, 7 *T. R.* 681, *Geyer v. Aguilar. East*, 473, *Oddy v. Boville.* 3 *Bos. & Pul.* 201, *Baring v. Clagett.* 5 *East*, 99, *Baring v. Royal Exch. Ins. Co*, 5 *East*, 155, *Bolton v. Gladstone.* Such also has been the course of decisions in the different American States. 1 *Binney*, 295, *Calhoun v. Penn. In. Co.* 3 *Binney*, 220, *Cheviot v. Faussat.* 2 *Johnson's N. Y. cases*, 451, *Vanderheuvel v. The United In. Co.* *S. C.* 127.

Such being the acknowledged effect of a foreign condemnation, the only remedy for the injured party is a resort to the Court of the captors for redress. If that government will not afford it, he must apply to his own, which will make it a national concern to be settled either by negotiation or war, if it be deemed a matter of sufficient importance. *Doug.* 614, *Le Caux v. Eden.*

The fact that the *Milan decree* was a violation of the law of nations, and of our neutral rights, can make no difference. For if an unjust condemnation, professing

WILLIAMS
& OTHERS
*v.*
ARMROYD
& OTHERS.

WILLIAMS
& OTHERS
*v.*
ARMROYD
&OTHERS.

to be founded upon a just law, be conclusive, there is no reason why a condemnation, founded upon an unjust law, should not be equally conclusive.

The question is not, whether this Court will lend its aid to carry into effect the Milan decree, but whether it will reverse the sentence of a foreign Court, and destroy vested rights acquired under such a sentence by a *bona fide* purchaser.

But it is said the purchase was made before the sentence of condemnation was passed, and was therefore void. This, however, can make no difference. The effect of the condemnation is not to vest the property, but to sanctify a title which was vested by the capture ; to confirm all intermediate acts, and to give a judicial sanction to that which was already sufficiently firm in point of fact. 1 *Wils.* 211. 2 *Azuni*, 262. 12 *Mod.* 134, *Rex v. Broome.* *Carth.* 398. *S. C.* The condemnation does not give property, it only establishes the fact that the captor had a lawful title by the capture. These maritime sales in market overt give an indefeasible title. 4 *Johnson*, 38, 39, *Grant v. M'Lachlan.* In cases of foreign attachment, if the attached goods are perishable, or from their situation are exposed to peculiar danger, the constant practice is to order a sale, and such sales are valid, although the attaching creditor may fail to support his claim.

It is an established principle, says the Court of errors, (2 *Johnson's cases*, 458,) that any person purchasing will be secure.

LAW, *in reply,* cited the cases of *Geyer v. Aguilar, Pollard v. Bell, Price v. Bell, Bird v. Appleton, Mayne v. Walter.* 1 *Rob.* 144, and *Havelock v. Rockwood,* 8 *T. R.* 268, to show that there must be a good cause for condemnation by the law of nations. He cited also, 4 *Cr.* 221. *Doug.* 574, and 1 *Rob.* 139, to the same point, and to show the limitation of the general principle of conclusiveness of a foreign sentence. As to the extent of the power of France over neutral commerce, he cited *Marten's Law of Nations,* 332 ; and to show that the Berlin and Milan decrees were in violation of our neutral rights, and were so declared by our government, he referred to the *President's message to Congress* of the

*15th of December,* 1810, and cited 4 *Cr.* 292, *Rose v.* WILLIAM.
*Himely.* 3 *Rob.* 99, 333, 2 *Rob.* 239.                    & OTHERS

*v.*

To show that the Court must have jurisdiction, be- ARMROYD
fore its decree can be conclusive, he cited 4 *Cr.* 471. 3 & OTHERS.
*Rob.* 96. To support the position that a sale before con-  —————
demnation is not valid, he cited *Marten's* 382. 4 *Cr.* 250.
1 *Browne's civil law,* 254. 1 *Rob.* 139.

DÁNA, *on the same side.*

This is an appeal by a citizen of the United States
his government for redress for a violation of his neutral
rights by a foreign sovereign. This Court exercises
that branch of the government, which, in some coun
tries of Europe, is exercised by the sovereign himself.
The only question is, whether this Court has power to
declare void a condemnation founded upon a decree.
which the legislature and the executive of the United
States have declared to be a violation of our neutral
rights, and contrary to the law of nations. This is a
question never before agitated in the Courts of the Unit-
ed States.

This vessel has not violated the law of nations, nor
the municipal law of any state or nation.

The sovereign power of a nation cannot be exercised
on the high seas, unless over its own subjects or pirates,
or *jure belli.* It can affect *hostile* property only. A mu-
nicipal regulation can not rightfully affect neutral pro-
perty, beyond the territorial jurisdiction. On the high
seas all nations are equal. This property, having never
been within the French jurisdiction, can never have of-
fended against French municipal law. The Court had
no jurisdiction under the municipal law of France in
such a case. Suppose, in case of capture and re-
capture, the first captors proceed to libel and condemn
the property in a French Court, while it is safe in a
port of the United States, having never been within the
jurisdiction of France. It can never be pretended that
such a condemnation would be valid.

The title and possession must be delivered together at
the same time, or the sentence will not be conclusive *in
rem.*

WILLIAMS    In the cases of *Rose & Himely*, and *Hudson & Gues-*
& OTHERS *tier*, the property was sold *by an agent of the Court;*
    *v.*       but the Dutch governor of St. Martin's, had no autho-
ARMROYD rity from the tribunal at Guadaloupe. It has been de-
& OTHERS. cided in the Courts of the United States, that Holland
————————— is not a dependency of France.  Captors cannot sell or
dispose of the property captured, before the capture has
been adjudged lawful by a competent Court.  It is the
interest of all nations to enforce this rule.  The oppo-
site practice would lead to incalculable evils.

*March 8th......*MARSHALL, *Chief Justice,* delivered the
opinion of the Court as follows :

A vessel, with a cargo belonging in part to the Ap-
pellants, was captured on the high seas, on the 20th of
August, 1809, by a French privateer, and carried to
St. Martins, where the vessel and cargo were sold, by
order of the governor, at public auction, and part of
the cargo purchased and sent to the Appellees in Phila-
de phia.   After the sale, the vessel and cargo were con-
demned by the Court of prize, sitting at Guadaloupe,
professedly for a violation of the *Milan decree* in trad-
ing to a dependence of England.  On the arrival of the
goods, they were claimed by the original owner, who
filed a libel for them.  In the District Court they were
adjudged to him.  The Circuit Court reversed that sen-
tence, and from the judgment of the Circuit Court
there is an appeal to this Court.

It appears to be settled in this country, that the sen-
tence of a competent Court, proceeding *in rem*, is con-
clusive with respect to the thing itself, and operates as
an absolute change of the property.  By such sentence,
the right of the former owner is lost, and a complete
title given to the person who claims under the decree.
No Court of co-ordinate jurisdiction can examine the
sentence.  The question, therefore, respecting its con-
formity to general or municipal law, can never arise,
for no co-ordinate tribunal is capable of making the in-
quiry.  The decision, in the case of *Hudson & Smith,
v. Guestier,* reported in 6th Cranch, is considered as
fully establishing this principle.

It is contended that the sentence, in this case, has not
changed the property, because

1st. The sale was made under the direction of the go-
vernor of St. Martins, before the sentence of condemna-
tion was pronounced.

2d. The sentence proves its own illegality, because
it purports to be made under a decree which the govern-
ment of the United States has declared to be subversive
of neutral rights and national law.

1st. In support of the first objection, it has been urg-
ed, that the jurisdiction of the Court depends on the
possession of the *thing;* that a sentence is a formal de-
cision, by which a forcible possession is converted into
a civil right; and that the possession being gone, there
remains nothing on which the sentence can operate.

However just this reasoning may be when applied to a
case, in which the possession of the captor has been di-
vested by an adversary force; as in the cases of re-
capture, rescue, or escape; its correctness is not ad-
mitted when applied to this case. The possession is not
an adversary possession, but the possession of a person
claiming under the captor. The sale was made on the
application of the captor, and the possession of the ven-
dee is a continuance of his possession.

The capture is made by and for the government; and
the condemnation relates back to the capture, and af-
firms its legality.

2d. That the sentence is avowedly made under a de-
cree subversive of the law of nations, will not help the
Appellant's case, in a Court which cannot revise, cor-
rect, or even examine that sentence. If an erroneous
judgment binds the property on which it acts, it will not
bind that property the less because its error is apparent.
Of that error, advantage can be taken only in a Court
which is capable of correcting it.

It is true that in this case there is the less difficulty in
saying, that the edict under which this sentence was pro-
nounced, is a direct and flagrant violation of national
law, because the declaration has already been made by
the legislature of the Union. But what consequences
attend this legislative declaration? Unquestionably the

WILLIAMS
& OTHERS
*v.*
ARMROYD
& OTHERS.

<div style="margin-left:auto">

WILLIAMS
& OTHERS

v.

ARMROYD
& OTHERS.

</div>

legislature which was competent to make it, was also competent to limit its operation, or to give it effect by the employment of such means as its own wisdom should suggest. Had one of these been, that all sentences pronounced under it should be considered as void, and incapable of changing the property they professed to condemn, this Court could not have hesitated to recognize the title of the original owner in this case. But the legislature has not chosen to declare sentences of condemnation, pronounced under this unjustifiable decree, absolutely void. It has not interfered with them. They retain therefore the obligation common to all sentences whether erroneous or otherwise, and bind the property which is their object; whatever opinion other co-ordinate tribunals may entertain of their own propriety, or of the laws under which they were rendered.

*The sentence is affirmed with costs.*