11 U.S. 423
 7 Cranch 423
 3 L.Ed. 392
 WILLIAM WILLIAMS AND OTHERS, APPELLANTS,
v.
GEORGE ARMROYD AND OTHERS, APPELLEES.
 February 25, 1813
 
 1
 Absent, TODD, J.
 
 
 2
 THIS was an appeal from the sentence of the Circuit Court for the district of Pennsylvania, which dismissed the libel with costs.
 
 
 3
 The libel stated, that the schooner Fortitude, owned by Williams and others, citizens of the United States, having taken in a cargo of molasses at Martinico, sailed on the 20th of August, 1809, for New London. That on the next day she was piratically seized on the high seas by an armed schooner, shewing no colours, but asserted to be from Guadaloupe, and carried into St. Martin's, where the captain's papers were taken from him, and the vessel and cargo detained, as it was asserted, to wait the event of a trial. That on the 9th of September, the prize-master left St. Martin's for Guadaloupe, with a copy of the schooner's papers, under pretence of causing proceedings to be instituted in the French Court of Admiralty in that island. That on the 23d of September, the master of the Forititude went to St. Barthalomews, and on his return was informed, that during his absence the Governor had ordered the vessel and cargo to be sold at public sale; which was done and bought for the Governor and one of his council, as the Libellants believed. That immediately after the sale, the Governor took possession of the vessel, and on the 2d of October the cargo was landed, and 97 hogsheads of the molasses were shipped on board another vessel to Philadelphia, where they arrived, consigned to Armroyd and others, of whom the Libellants demanded it, but they refused to deliver it, or to account for the value of it.
 
 
 4
 A claim was interposed by George Armroyd & Co. in behalf of Richardson & Carty, and others, which stated, that on the 21st of August, 1809, and long before, war existed between Great Britain and France; that the Fortitude, being an American vessel at peace with the French empire, on her voyage from Martinico, a British colony, where she had been trading with the enemies of the French empire, during the war, in violation of the decrees and regulations of that empire, was seized by a French privateer, and carried to St. Martin's, as lawful prize to the captors; and her papers sent to a French tribunal, having competent jurisdiction, at Guadaloupe, under the sole and exclusive dominion and jurisdiction of the French empire; but the papers were captured on the passage to Guadaloupe. That the vessel and cargo, being so carried into St. Martin's, were there bona fide sold by order of the Dutch governor at the island, to whom such right belonged, by the laws and constitutions of the said island; and the goods in question, part of the cargo, were bona fide purchased by a certain I. L. Lapierre, and by him bona fide sold to a certain Abraham Concheyter, from whom they were afterwards bona fide purchased by Richards & Carty, for account of themselves and others.
 
 
 5
 By consent of parties, a sentence was passed proforma in the District Court, for the Libellants.
 
 
 6
 In the Circuit Court, upon the appeal, the Claimants exhibited a further answer, stating, that by a decree of the Registry of the Commission for prize causes of the island of Guadaloupe, and its dependencies, duly constituted a Court of Prize by the Emperor of France, on the 12th of October, 1809, the schooner Fortitude, and her cargo, were condemned, by a sentence which is set forth at large in the answer; the substance of which sentence is included in the following extract, viz.
 
 
 7
 'It results from the examination and from the analysis of the papers just mentioned, that the schooner Fortitude, captured by the French privateer, Le Fripon, is the property of a citizen of the United States of America; that she sailed from New London, bound to Martiuico, at which place she sold her cargo, and took in another of molasses for the said port of New London, and consequently she has incurred the penalty, pronounced by the 3d article of the Imperial decree, which directs new measures against the maritime system of England, and was given at the Royal Palace of Milan, on the 17th of September, 1807, inserted in the bulletin of the laws, No. 169, which article is as follows:
 
 
 8
 Every vessel whatever, and whatever be her cargo, which shall have cleared from any English port, colony, or country occupied by English troops, or which shall be bound to any English port, colony or country occupied by English troops, shall be good prize, as having infringed the present decree. Such vessels shall be captured by our men of war, and awarded to the captors.''And after having heard the opinion of the inspector of marine, we have declared, and do declare, the American schooner Fortitude to have been well and duly captured by the French privateer, Le Fripon, and to be forfeited to the owners and crew of the said privateer; consequently the said schooner Fortitude, together with her cargo, is awarded to the captors to be sold in the customary form, if the sale has not already taken place; and the proceeds shall be distributed conformably to the ordinance concerning captures,' &c.
 
 
 9
 On the 19th of April, 1811, the Circuit Court reversed the sentence of the District Court, with costs; from which sentence of reversal, the Libellants appealed to this Court.
 
 
 10
 LYMAN LAW, for the Appellants.
 
 
 11
 This condemnation was founded upon the Milan decree, which is admitted, on its face, to be in violation of the law of nations. It does not proceed on the ground of its being the property of an enemy, nor contraband of war, nor for violating a blockade. If it appear from the sentence itself, that the condemnation was not upon any ground recognized by the law of nations, nor upon the violation of any municipal right acknowledged by that law, this Court will not carry it into effect. France may, by her own municipal laws, regulate her own trade, but she has no right to control ours, beyond her territorial jurisdiction, further than to protect her own belligerent rights, acknowledged by the law of nations. If we violate no such right, and if we do not carry our property within her territorial jurisdiction, she has no right to regulate our trade. Her condemnation, grounded upon regulations which she has no right, according to the law of nations, to make, is void. But even if she had a right to condemn, her condemnation can transfer no title, unless the thing itself be in her possession, at the time of condemnation, so that the possession may pass with the title. Here the property never was within the jurisdiction of the Court at Guadalope. It had been sold and delivered by the Dutch governor, before the condemnation. It does not appear that he had any authority either from the captors, or from the Court, to make the sale. The purchaser cannot derive from the governor a better title than the governor had at the time of sale.
 
 
 12
 I. R. INGERSOLL, contra.
 
 
 13
 It is acknowledged that a tribunal, professing to be a Court of Admiralty, has condemned the property in question, and that the Appellees possess it by virtue of a capture on the high seas. This is prima facie evidence of the correctness of the title, and throws the onus probandi upon the Appellants.
 
 
 14
 A Court of Admiralty is a Court whose jurisdiction is co-ordinate with that of every other throughout the world. The Admiralty law is 'of all times and of all nations,' and its decrees, so far as they uffect the thing itself, and so long as they remain unreversed, can never be questioned. The end being gained, it is an immaterial question, what were the means, as they are sanctified by the end. Whether the proceedings are erroneous, or not, according to our notions of right and wrong, whether they are predicated upon a mistake of the law, or of the fact, or are founded upon regulations consistent with, or repugnant to, the law of nations, are questions wholly immaterial. The sentence has sealed the proceedings, and those questions can never judiciary come before this Court.
 
 
 15
 In confirmation of these positions, it might be sufficient to refer to the decisions of this Court, where the principles are settled.
 
 
 16
 In the case of Rose v. Himely, 4 Cr. 292, this Court refused to confirm the property of the alleged purchaser, because the Court, passing sentence, had neither the actual nor constructive jurisdiction, nor power, over the subject the controversy. The point upon which it was decided was, that the vessel and cargo were seized, out of the territorial jurisdiction claimed by the French government of St. Domingo, for a breach of municipal regulations, and were never carried within that jurisdiction, but were sold by the captor at a foreign port.
 
 
 17
 Two Judges, (the Chief Justice and Judge Washington) thought that, in order to give jurisdiction, the property should have been taken as prize of war, and brought infra praesidia. Three (Judges Cushing, Chase and Livingston) were of opinion, that it would be conclusive even under a municipal regulation, provided it were carried to the country of the captors. Judge Johnson considered it conclusive at all events. But even in that case, the Chief Justice says, in p. 276, 'If the 'Court of St. Domingo had jurisdiction, the sentence 'is conclusive.' In the case of Hudson and others v. Guestier, and La Font v. Bigelow, 4 Cr. 293, it is decided that, in case of prize of war, a condemnation, while lying in a neutral port, will bind the property; an that the same principle applies to a seizure made within the territory of a state, for a violation of its municipal laws, p. 296. Judges Chase and Livingston dissented, because the vessel was not carried into a French port for trial. Judge Johnson adhered to his former opinion, that it was immaterial whether the capture was made in the exercise of municipal or belligerent rights, or whether within the jurisdictional limits of France, where she is supreme, or upon the high seas, where her authority is concurrent with that of other nations. P. 298.
 
 
 18
 In the case of Croudson and others, v. Leonard, 4 Cr. 434, it was decided, that a sentence of condemnation for breach of blockade, was conclusive evidence of a violation of the warranty of neutrality in a policy of insurance.
 
 
 19
 In the case of Rose & Himely, above mentioned, the incidental questions were decided in favor of our positions; for here it was prize of war, seized and condemned within the jurisdiction of the Court; yet it may be said the issue of that case was adverse. If so, it was expressly over-ruled in Hudson & Smith, v. Guestier, 6 Cr. 281. The Court there unanimously decided, that the judge of the French Court must have had a right to dispese of every question made in behalf of the owner of the property, whether it related to the jurisdiction of the Court, or arose out of the law of nations, or out of the French decrees, or in any other way: and even if the reasons of his judgment should not be satisfactory, it would be no ground for a foreign Court to rescind his proceedings, and to refuse to consider his sentence as conclusive on the property; and that, as the title was changed by the condemnation at Guadalope, the original owner had no right to pursue it in the hands of a vendee.
 
 
 20
 But this is no new principle of law originating with the present state of the world, which would seem rather to forbid it; since the rapacity of Courts of admiralty on the one side, and their acknowledged subserviency to the governing power on the other, diminish the respect which would otherwise be due to their sentences.
 
 
 21
 The conclusive effect of a foreign sentence in changing the property seems to have been first judicially decided in the case of Hughes v. Cornelius, 2 Shower, 242. Sir T. Raymond, 473. Skin. 59. Lord Raym. 893. 935. Vern. 21. The authority of this case has never been questioned. The only question has been as to the collateral effect between underwriters and the assured in cases of warranty in a policy of insurance. And even there, whenever the condemnation has been upon the ground of its being the property of an enemy, the sentence has always been holden to be conclusive, without regard to the circumstances by which the Court came to that result. The sentence is conclusive as to whatever it purports to decide. Park. 355. 360, 361-2, Rob. 173, The Christopher. 4 Rob. 35, The Henrick and Maria. 5 Rob. 255, The Comet. 4 Rob. 3, The Helena. 3 Bos. & Pul. 505, Lothian v. Henderson, 7 T. R. 526, Calvert v. Boville, 7 T. R. 681, Geyer v. Aguilar. East, 473, Oddy v. Boville. 3 Bos. & Pul. 201, Baring v. Clagett. 5 East, 99, Baring v. Royal Exch. Ins. Co. 5 East, 155, Bolton v. Gladstone. Such also has been the course of decisions in the different American States. 1 Binney, 295, Calhoun v. Penn. In. Co. 3 Binney, 220, Cheviot v. Faussat. 2 Johnson's N. Y. cases, 451, Vanderheuvel v. The United In. Co. S. C. 127.
 
 
 22
 Such being the acknowledged effect of a foreign condemnation, the only remedy for the injured party is a resort to the Court of the captors for redress. If that government will not afford it, he must apply to his own, which will make it a national concern to be settled either by negotiation or war, if it be deemed a matter of sufficient importance. Doug. 614, Le Caux v. Eden.
 
 
 23
 The fact that the Milan decree was a violation of the law of nations, and of our neutral rights, can make no difference. For if an unjust condemnation, professing to be founded upon a just law, be conclusive, there is no reason why a condemnation, founded upon an unjust law, should not be equally conclusive.
 
 
 24
 The question is not, whether this Court will lend its aid to carry into effect the Milan decree, but whether it will reverse the sentence of a foreign Court, and destroy vested rights acquired under such a sentence by a bona fide purchaser.
 
 
 25
 But it is said the purchase was made before the sentence of condemnation was passed, and was therefore void. This, however, can make no difference. The effect of the condemnation is not to vest the property, but to sanctify a title which was vested by the capture; to confirm all intermediate acts, and to give a judicial sanction to that which was already sufficiently firm in point of fact. 1 Wils. 211. 2 Azuni, 262. 12 Mod. 134, Rex v. Broome. Carth. 398. S. C. The condemnation does not give property, it only establishes the fact that the captor had a lawful title by the capture. These maritime sales in market overt give an indefeasible title. 4 Johnson, 38, 39, Grant v. M'Lachlan. In cases of foreign attachment, if the attached goods are perishable, or from their situation are exposed to peculiar danger, the constant practice is to order a sale, and such sales are valid, although the attaching creditor may fail to support his claim.
 
 
 26
 It is an established principle, says the Court of errors, (2 Johnson's cases, 458,) that any person purchasing will be secure.
 
 
 27
 LAW, in reply, cited the cases of Geyer v. Aguilar, Pollard v. Bell, Price v. Bell, Bird v. Appleton, Mayne v. Walter. 1 Rob. 144, and Havelock v. Rockwood, 8 T. R. 268, to show that there must be a good cause for condemnation by the law of nations. He cited also, 4 Cr. 221. Doug. 574, and 1 Rob. 139, to the same point, and to show the limitation of the general principle of conclusiveness of a foreign sentence. As to the extent of the power of France over neutral commerce, he cited Marten's Law of Nations, 332; and to show that the Berlin and Milan decrees were in violation of our neutral rights, and were so declared by our government, he referred to the President's message to Congress of the 15th of December, 1810, and cited 4 Cr. 292, Rose v. Himely. 3 Rob. 99, 333, 2 Rob. 239.
 
 
 28
 To show that the Court must have jurisdiction, before its decree can be conclusive, he cited 4 Cr. 471. 3 Rob. 96. To support the position that a sale before condemnation is not valid, he cited Marten's 332. 4 Cr. 250. 1 Browne's civil law, 254. 1 Rob. 139.
 
 
 29
 DANA, on the same side.
 
 
 30
 This is an appeal by a citizen of the United States to his government for redress for a violation of his neutral rights by a foreign sovereign. This Court exercises that branch of the government, which, in some countries of Europe, is exercised by the sovereign himself. The only question is, whether this Court has power to declare void a condemnation founded upon a decree which the legislature and the executive of the United States have declared to be a violation of our neutral rights, and contrary to the law of nations. This is a question never before agitated in the Courts of the United States.
 
 
 31
 This vessel has not violated the law of nations, nor the municipal law of any state or nation.
 
 
 32
 The sovereign power of a nation cannot be exercised on the high seas, unless over its own subjects or pirates, or jure belli. It can affect hostile property only. A municipal regulation can not rightfully affect neutral property, beyond the territorial jurisdiction. On the high seas all nations are equal. This property, having never been within the French jurisdiction, can never have offended against French municipal law. The Court had no jurisdiction under the municipal law of France in such a case. Suppose, in case of capture and recapture, the first captors proceed to libel and condemn the property in a French Court, while it is safe in a port of the United States, having never been within the jurisdiction of France. It can never be pretended that such a condemnation would be valid.
 
 
 33
 The title and possession must be delivered together at the same time, or the sentence will not be conclusive in rem.
 
 
 34
 In the cases of Rose & Himely, and Hudson & Guestier, the property was sold by an agent of the Court; but the Dutch governor of St. Martin's, had no authority from the tribunal at Guadaloupe. It has been decided in the Courts of the United States, that Holland is not a dependency of France. Captors cannot sell or dispose of the property captured, before the capture has been adjudged lawful by a competent Court. It is the interest of all nations to enforce this rule. The opposite practice would lead to incalculable evils.
 
 March 8th.
 
 35
 MARSHALL, Chief Justice, delivered the opinion of the Court as follows:
 
 
 36
 A vessel, with a cargo belonging in part to the Appellants, was captured on the high seas, on the 20th of August, 1809, by a French privateer, and carried to St. Martins, where the vessel and cargo were sold, by order of the governor, at public auction, and part of the cargo purchased and sent to the Appellees in Philadelphia. After the sale the vessel and cargo were condemned by the Court of prize, sitting at Guadaloupe, professedly for a violation of the Milan decree in trading to a dependence of England. On the arrival of the goods, they were claimed by the original owner, who filed a libel for them. In the District Court they were adjudged to him. The Circuit Court reversed that sentence, and from the judgment of the Circuit Court there is an appeal to this Court.
 
 
 37
 It appears to be settled in this country, that the sentence of a competent Court, proceeding in rem, is conclusive with respect to the thing itself, and operates as an absolute change of the property. By such sentence, the right of the former owner is lost, and a complete title given to the person who claims under the decree. No Court of co-ordinate jurisdiction can examine the sentence. The question, therefore, respecting its conformity to general or municipal law, can never arise, for no co-ordinate tribunal is capable of making the inquiry. The decision, in the case of Hudson & Smith, v. Guestier, reported in 6th Cranch, is considered as fully establishing this principle.
 
 
 38
 It is contended that the sentence, in this case, has not changed the property, because 1st. The sale was made under the direction of the governor of St. Martins, before the sentence of condemnation was pronounced.
 
 
 39
 2d. The sentence proves its own illegality, because it purports to be made under a decree which the government of the United States has declared to be subversive of neutral rights and national law.
 
 
 40
 1st. In support of the first objection, it has been urged, that the jurisdiction of the Court depends on the possession of the thing; that a sentence is a formal decision, by which a forcible possession is converted into a civil right; and that the possession being gone, there remains nothing on which the sentence can operate.
 
 
 41
 However just this reasoning may be when applied to a case, in which the possession of the captor has been divested by an adversary force; as in the cases of recapture, rescue, or escape; its correctness is not admitted when applied to this case. The possession is not an adversary possession, but the possession of a person claiming under the captor. The sale was made on the application of the captor, and the possession of the vendee is a continuance of his possession.
 
 
 42
 The capture is made by and for the government; and the condemnation relates back to the capture, and affirms its legality.
 
 
 43
 2d. That the sentence is avowedly made under a decree subversive of the law of nations, will not help the Appellant's case, in a Court which cannot revise, correct, or even examine that sentence. If an erroneous judgment binds the property on which it acts, it will not bind that property the less because its error is apparent. Of that error, advantage can be taken only in a Court which is capable of correcting it.
 
 
 44
 It is true that in this case there is the less difficulty in saying, that the edict under which this sentence was pronounced, is a direct and flagrant violation of national law, because the declaration has already been made by the legislature of the Union. But what consequences attend this legislative declaration? Unquestionably the legislature which was competent to make it, was also competent to limit its operation, or to give it effect by the employment of such means as its own wisdom should suggest. Had one of these been, that all sentences pronounced under it should be considered as void, and incapable of changing the property they professed to condemn, this Court could not have hesitated to recognize the title of the original owner in this case. But the legislature has not chosen to declare sentences of condemnation, pronounced under this unjastifiable decree, absolutely void. It has not interfered with them. They retain therefore the obligation common to all sentences whether erroneous or otherwise, and bind the property which is their object; whatever opinion other co-ordinate tribunals may entertain of their own propriety, or of the laws under which they were rendered.
 
 
 45
 The sentence is affirmed with costs.