## THE POTOMAC.

1. Although the duty of vessels propelled by steam is to keep clear of those moved by wind, yet these latter must not, by changing their course, instead of keeping on it, put themselves carelessly in the way of the former, and so render ineffective their movements to give the sailing vessels sufficient berth.

2. The confessions of a master, in a case of collision, are evidence against the owner.

APPEAL from a decree of the Circuit Court of New York, in a case of collision between the schooner Bedell and the steamer Potomac, in the Chesapeake Bay, resulting in the total loss of the schooner. The collision occurred on a starlight night in July. The schooner was heading about north, going up the bay, sailing by the wind, closehauled, with a fresh breeze, west-northwest. Whether or not she had a light on board was a matter about which the evidence was contradictory; the weight of it being to the effect that she had not. The steamer, with a good lookout and a full number of seamen, was descending the bay and sailing due south at about nine miles an hour, with all her lights set and brightly burning. When about three-quarters of a mile off the schooner was discovered on the starboard bow of the steamer by the lookout of the steamer, who reported the fact to the officer in charge. The order was immediately given to starboard the helm two points, and after this was

done, and the mate who had the command saw the vessel about half a point on the starboard bow, the further order was given and executed to steady the helm.

In addition to this, the mate, in watching the movements of the schooner, discovered, notwithstanding his efforts to give her a wide berth to the west, that she was still approaching nearer the steamer, and again starboarded his helm, and slowed and backed. The captain of the schooner, however, about two minutes before the collision, ordered her helmsman to put her helm hard up; and the movements of the steamer thus proved ineffectual to prevent the boats coming together. He had not seen the steamer until when within half a mile of her. When the vessels struck, the schooner had fallen off from about a north course to nearly an east one.

The helmsman of the steamer testified, that the mate of the steamer was asleep when the schooner was reported to him; but this the mate denied. It was certain that he was on deck immediately afterwards, unconfused and energetic.

When the vessels struck, the captain of the schooner, who was hauled over the railing upon the steamer, and so saved, was asked by the mate why he had kept his vessel right across the steamer's bows; to which he replied that he did not understand the steamer's lights till too late; and while talking afterwards with the captain said that he had "no one to blame but himself." Subsequently, in a conversation at the notary's office, where he happened to be, making his protest, he stated that he "mistook the steamer's lights, and supposed them to be on the stern instead of on the bow."

The District Court decreed against the steamer; a decree which the Circuit Court reversed. The question in this court was whether the reversal was right.

*Mr. E. C. Benedict, for the appellant; Mr. B. R. Curtis, contra.*

Mr. Justice DAVIS delivered the opinion of the court.

It is a rare occurrence in the history of cases of this kind,

where a sailing vessel and steamship approaching each other in opposite directions, or on intersecting lines, have come in contact, that the sailing vessel has been adjudged to be in fault. The law casting the greater responsibility on the steamer on account of her motive power, and the sailing vessel having an easy duty to perform, it has been generally found on investigation, that the collision was the result of a relaxation of vigilance on the part of the officers of the steamer. It has sometimes happened, however, that the steamer was not to blame, and the present case, in our opinion, is one of that character. It is unnecessary to restate the rules of navigation, obligatory upon vessels in the predicament these were on the night in question. They were elaborately presented by this court in the case of *The Steamship Co.* v. *Rumball,*[*] and were recently affirmed in the case of *The Carroll.*[†] One of these rules requires the steamer to keep out of the way of the sailing vessel; but to enable her to do this effectively, the law imposes the corresponding obligation on the sailing vessel to keep her course. If, therefore, the steamer adopts proper measures of precaution to avoid the collision, which would have been effective if the schooner had not changed her course, she is not chargeable for the consequences of the collision. Any other rule would condemn the steamer, no matter how gross the misconduct of the sailing vessel.

That the steamer, on this occasion, seasonably employed the proper measures to have prevented this disaster, and that it would not have occurred, if the schooner had been equally mindful of her duty, is, we think, unmistakably shown by the evidence. The proceedings taken on board the steamer were enough, if the schooner had kept her course, to have placed the respective boats out of reach of danger. The accident could have happened in no other way than by a change of the schooner's course, and that this was made is evident, for when the vessels collided the schooner had fallen off from about a north course to nearly

---

[*] 21 Howard, 372.      [†] *Supra,* 302.

an east course. Besides, the only man on board the schooner who was examined as a witness, says that he put his helm hard up, by the captain's order, about two minutes before the collision. If the schooner had kept her course, instead of porting her helm and changing it to the eastward, the collision would not have occurred.

The effect of the change of course was to bring the schooner directly across the steamer's track, and to render what followed inevitable. There is nothing in the record to show a justification for this change of course, and it will not do to say it was taken on account of the dangerous proximity of the vessels, for at the united rate at which they were running, they were, according to the testimony of the wheelsman of the schooner as to the point of time when he ported her helm, at least half a mile apart. We think it is clear that this change of course was adopted earlier than the wheelsman says; but be this as it may, whenever adopted there was no necessity for it, either real or apparent, and the persons in charge of the schooner do not furnish even an excuse for their conduct.

It is not seen in what respect the steamer was remiss. She had the full complement of competent seamen, the necessary lookout and lights, and began her measures to keep clear of the schooner as soon as she was observed. That she was not sooner observed was not the fault of those in charge of the steamer, for the schooner was sailing without a light; and there is nothing to show that the lookout of the steamer, by vigilant watching, could have reported her any sooner. It is true the evidence is somewhat conflicting on the point of whether the schooner had a light or not, but the better opinion on the whole case is, that she had no light.

If the persons on board the steamer were watchful, it was not the case with those in control of the schooner, for, if they had been equally attentive to their business, they would not have allowed the steamer—sailing as she was in a starlight night, and with her lights brightly burning—to have approached within a half mile, without being seen by them.

We have considered this case thus far without reference to the admissions of the master of the schooner on this subject, but if we give them their proper weight, they corroborate very strongly the view we take of the cause of this collision. The master admitted, as soon as he was taken on board the steamer after the disaster, that the collision occurred through his fault, and this admission was repeated when he noted his protest. His statements on the point were full and explicit, and could not have been easily misunderstood; but if they were not true, or were misunderstood, why was he not called to contradict or explain them? The legality of this evidence cannot be questioned, for courts of admiralty have uniformly allowed the declarations of the master, in a case of collision, to be brought against the owner, on the ground that when the transaction occurred, the master represented the owner, and was his agent in navigating the vessel. This sort of evidence is confined to the confessions of the master, and cannot be extended to any other person in the employment of the boat, for in no proper sense has the owner intrusted his authority to any one but the master. The authorities on this subject are collected in the case of *The Enterprise.**

It has been argued that the lookout and helmsman of the steamer, whose testimony was taken by the owner of the schooner, prove want of vigilance on the part of the steamer. We have carefully examined this testimony, and cannot see that it materially contradicts the testimony given by the officers of the steamer, save in one particular. The helmsman says the mate was asleep when the schooner was reported to him, but this the mate expressly denies. It is not necessary, however, to determine this point, because the evidence clearly shows that as soon as the schooner was discovered and reported, and there was a necessity for action, the mate was wide awake, and promptly gave the necessary order to starboard the helm, which order was as promptly executed. This was timely done, and would have been effectual but for

---

* 2 Curtis, 320.

the subsequent fault of the schooner, for which she is adjudged to bear the loss caused by this collision.

JUDGMENT AFFIRMED.