## THE ROANOKE.[1]

### WARREN v. THE ROANOKE.

#### (District Court, S. D. New York.  April 3, 1891.)

COLLISION—STEAM AND SAIL—CHANGE OF COURSE SEVEN POINTS BY SAILING VESSEL.
The steam-ship Roanoke was off the Jersey coast, steering S. S. W., ½ W., on a clear moonlight night. She saw nearly ahead the green light of the brig Hyperion, which was sailing N. E. by N., with the wind one point free. The green light of the brig soon after shut in, and her red light appeared. nearly ahead of the steamer, whereupon the steamer hard a-ported, and held the port helm until the collision. The vessels at the time the steamer ported were about half a mile apart. When the vessels were very near, the green light of the brig reappeared, whereupon the steamer stopped and backed, but was unable to avoid collision, and the brig was sunk. *Held*, on the evidence, that the collision was due to the fault of the brig in changing her course when the vessels were very near, and that the steam-ship was not liable for the collision.

In Admiralty. Suit to recover damages caused by collision.
*Owen, Gray & Sturges*, for claimant.
*George A. Black*, for libelant.

BROWN, J. On the night of October 20, 1888, the steam-ship Roanoke, bound south, came into collision with the brigantine Hyperion, bound north, off the Jersey coast, to the eastward of Absecom light. The Hyperion sank not long after the collision, and both ship and cargo were lost. This libel was filed to recover for the loss of the cargo. The question is whether the steamer was in any degree in fault. The wind was fresh from the north-west, the night clear, with moonlight, and poor for seeing lights. The previous course of the steamer was S. S. W., by ¼ W.; that of the Hyperion N. E. by N. The latter was on her port tack, with the wind one point free. In steering she yawed about one point each way from her mean course. The libelant claims that the

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

Hyperion kept her course, subject to this yawing, until a few moments before collision, when she luffed to ease the blow, and changed thereby from two to four points only. The claimants contend that the steamer took timely and sufficient measures to go to windward of the Hyperion, and that the collision was brought about solely by the latter's unjustifiable luff. Repeated examination of the testimony of the chief witness concerning the navigation of each vessel, and the probabilities of the case, satisfy me that the account given by the officers of the steamer is substantially correct; that the steamer's wheel was put hard a-port when she was nearly half a mile from the brig, and had the latter's red light straight ahead, or nearly so, the previous green light having been shut in; that at the time of collision the steamer must have been at least 500 feet to windward of the course on which the Hyperion would have been had she kept the course she was on when she first showed her red light to the steamer, and when the latter ported; that the steamer's porting as soon as the red light was seen was a timely and sufficient maneuver to perform her duty of keeping out of the way, by a reasonable and safe margin; and that this maneuver was thwarted without necessity and without excuse by the Hyperion, either through carelessness or mistake in the handling of her helm, whereby she luffed so as to change her head from seven to nine points to the westward. The angle of collision in this case is of controlling importance, because it proves a great change made in the Hyperion's course. The night was clear and light, and observation of the angle of collision was easy. The chief witnesses on both vessels agree, and their diagrams of the collision show, that the starboard bow of the Hyperion struck the port bow of the steamer near the cat-head of each, and that the angle of collision was only about three points. That the angle was small is confirmed also by the fact that the Hyperion's jib-boom was not touched. As the mean course of the Hyperion was previously crossing that of the steamer by about one point to the eastward, it follows that the combined changes of course made by the two vessels amounted to about fourteen points, or even more, if the Hyperion was previously, as seems probable, on an easterly yaw. At collision the steamer was not heading more than one point north of west; so that, allowing a change of seven points on her part, seven or eight points remain as the change made by the Hyperion. This is as favorable to the Hyperion as the headings at the moment of collision will admit.

On plotting the necessary courses of the two vessels, in order to reach collision in this manner, their situation from time to time accords so nearly with the testimony of the steamer's officers as strongly to confirm their story; while it is not compatible with the account given by the Hyperion as respects her red light. In turning 7 points to starboard under a port helm, the steamer, a vessel 287 feet long and of 2,354 tons burden, must have made a distance of at least 900 or 1,000 feet abeam of the line of her former course, (see Naval Mobilization, June, 1889, p. 462;) and considering that she slowed and backed a part of the time while turning, this change must have occupied at least two minutes. The

vessels must have been, therefore, nearly half a mile apart when the steamer ported, as the mate testifies. All the steamer's witnesses agree in saying that at that time the Hyperion's red light only was visible. There is no reason to doubt this testimony, nor is there any other imaginable reason why the mate should have ported. The mate undoubtedly saw the Hyperion's green light a short time before, and it was a little on his starboard bow. The Hyperion's testimony to this extent confirms the mate. The steamer's green light would naturally be seen much earlier than the Hyperion's. Each then showed green to green, and there was no need of immediate action. Considering the probable destination of the Hyperion, the fact that she was probably on her port tack, and might be making a course to the eastward of the steamer, as she really was, and that in that case she would also probably make an additional half point leeway to the eastward under the fresh wind from the northwest, it was proper for the mate of the steamer to wait a little, and see what change, if any, the brig might show, before he undertook to pass to leeward, rather than to starboard, which, under such circumstances, might be the better course. This delay was soon justified by the fact that the brig presently shut in her green light and showed her red light ahead, when still nearly half a mile distant, indicating that she was going to the eastward of the steamer's course. It was then right for the steamer to port her helm, which she immediately did, thus very speedily bringing the brig's red light considerably upon her own port bow, and the steamer continued her port helm till collision. The steamer had a right to expect that she would thus pass easily port to port, and that the leeway of the Hyperion would assist in giving a good space between them. This maneuver was in abundant season. It would have given the steamer a large margin in passing to windward but for the brig's unexpected luffing afterwards, and it was a complete and timely fulfillment in the first instance of the steamer's obligation. *The Potomac*, 8 Wall. 590. In the case of *The Star of Scotia*, 2 Fed. Rep. 591, the steamer was held liable because she did not sufficiently continue her change, but straightened up too soon. It was the same in the case of *The Bela*, 40 Fed. Rep. 899.

The only question that remains is whether, after the Hyperion's change of course was made known by the reappearance of her green light, the steamer had still sufficient opportunity to avoid collision by an observance of the rules of navigation, and the use of reasonable nautical skill, notwithstanding the Hyperion's fault. *The Gulf Stream*, 43 Fed. Rep. 895. When the green light reappeared, it was evident that their courses were again crossing, and that there was danger of collision. It was therefore the duty of the steamer to reverse, unless the vessels were so near each other that there was no reasonable chance of escaping collision by that means. If there was no such chance, it was a case *in extremis*, and no legal fault would be imputed to the steamer, whether at such a moment she adopted the best maneuver or not, as the danger was brought about by the fault of the Hyperion. *The Elizabeth Jones*, 112 U. S. 514, 5 Sup. Ct. Rep. 468. The mate, who was in charge, testified

that he had already slowed; that he estimated the distance of the brig at that time to be only about 600 feet, and that collision was unavoidable, except by going ahead; that he accordingly rang to go ahead full speed; but that the captain, who about that time came to the wheel-house, ordered the engines reversed, and that order was obeyed. The other witnesses all agree in making the vessels at that time very near each other. From the size and from the speed of the Roanoke (then not less than 8 or 9 knots) she could not stop by reversing full speed in less than 800 or 900 feet, or in less than 1½ minutes' time. *The Normandie,* 43 Fed. Rep. 162. To make that mode of avoiding collision possible, these vessels would therefore have to be more than 1,200 feet apart. The evidence leaves no doubt that their distance apart when the green light reappeared was much less than that; so that there seems no probability that the Roanoke could have avoided collision by instant reversal when the green light reappeared, and the delay in reversing was in fact but short. This is also confirmed by inspecting the probable courses of the two vessels. To have reached the place of collision so far to the westward the Hyperion must, I think, have been yawing to the eastward when she showed her red light, and very soon after have begun to recover herself by swinging to the northward, thus keeping the Roanoke nearly ahead, but not enough to show her green light again, until her final luff, probably nearly a minute before the collision. Prior to that luff, she must have had the Roanoke's red light for at least a minute on her own port bow. In one place the mate of the Hyperion, who was in charge, says that the steamer luffed and showed her red light only when she was three-fourths of a mile distant, which would make the time much longer during which the two vessels showed red to red. Her change of course towards the steamer in such a situation, about a minute before collision, was a gross fault. During the last minute the speed of the steamer was probably much reduced, though not to a stop. This is the only way in which I can account for the collision, according to the best proved facts. It confirms the credit that seems otherwise due to the steamer's witnesses, showing the steamer without fault, and that her maneuvers were thwarted by the fault of the brig in luffing some seven or eight points, and that this luff was not discoverable until too late to avoid collision. *The America,* 37 Fed. Rep. 813. Libel dismissed, with costs.