15 F.2d 459 (1926)
THE W. TALBOT DODGE.
UNITED STATES
v.
789 PACKAGES OF WHISKY et al.
District Court, S. D. New York.
January 12, 1926.
Emory R. Buckner, U. S. Atty., of New York City (Francis A. McGurk, of New York City, of counsel), for libelant.
William H. Lewis, of Boston, Mass., for claimant.
THACHER, District Judge.
The W. Talbot Dodge is a fishing schooner 45½ feet in length, with a net tonnage of 20 tons. She was built in Noank, Conn., in 1895, and on April 25, 1921, she was licensed and enrolled as a fishing vessel in the coasting trade for one year. Just before the expiration of the year, on April 12, 1922, at about 11:30 p. m., she was observed from a police launch coming up through the Narrows, in the harbor of New York. With the aid of a searchlight, those on board the police launch observed that she had no fishing gear on deck. She was kept under observation without inquiry until she had passed up the East River and was about under the Williamsburg Bridge. The master of the schooner was then asked by one of the police on board the launch what he had on board, to which he responded, "Liquor; about 400-odd cases of Scotch, and 25 barrels of Rye;" that he was on his way to St. Pierre, Canada, under British *460 registry, with sealed hatches, having come from Nassau, Bahama, and expected to stop at Twenty-Fourth street for supplies. When the schooner reached Twenty-Fourth street she anchored. The men on the police launch went ashore and notified their superiors, who communicated with the customs authorities. When the customs officers boarded the schooner, the master produced a clearance under seal of the Comptroller of Customs at Nassau, N. P., showing that the schooner had cleared at Nassau for St. Pierre, Miquelon, for orders, with a cargo of 2 barrels of gin and one barrel of whisky stowed on deck, and 22 barrels of whisky and 405 cases of whisky stowed in the hold. The clearance paper bears an indorsement in ink, "With hatches sealed by Customs Department, Nassau, Bahamas." The master again stated that he was going to St. Pierre; that he had come into port for provisions. He inquired the way to the custom house, and was directed how to get there. On the morning of the following day he appeared at the custom house, and was examined by a representative of the collector and by an assistant United States attorney. Stenographic notes of his examination were taken, and were offered and received in evidence.
On behalf of the claimant it is insisted that his admissions made at that time are incompetent and should be disregarded, citing Packet Co. v. Clough, 87 U. S. (20 Wall.) 528, 22 L. Ed. 406, where in an action at law, and under well-known common-law rules, the admissions of the master of a vessel regarding the happening of an accident thereon, made two days after the event, were excluded. The admiralty rules are different, and the admissions of the master, made after the event, are admissible to charge the ship or her owners. The Potomac, 75 U. S. (8 Wall.) 590, 19 L. Ed. 511; The Enterprise, 2 Curt. 329, Fed. Cas. No. 4,497; The Lisbonense, 53 F. 293, 3 C. C. A. 539; The S. S. Wilhelm, 59 F. 169, 8 C. C. A. 72; The Fanwood (D. C.) 61 F. 523; The Severn (D. C.) 113 F. 578; Frederick Leyland & Co. v. Hornblower, 256 F. 289, 296, 167 C. C. A. 461. The rule of these decisions is a general rule of evidence in admiralty. It arises from the peculiar relation of the master to the ship, and from the fact that admiralty courts are not bound by common-law rules requiring the exclusion of evidence in the trial of issues before a jury.
There is more reason for receiving the statements of the master to the port authorities regarding the business of his ship than there is for receiving his explanations of a collision after the occurrence. Indeed, the instant case is stronger than the cited cases, because the circumstances of the schooner's arrival were such as to demand explanation, and the master, in the performance of his duty, was undoubtedly called upon to explain to the authorities of the port his reasons for coming to anchor in the East River at Twenty-Fourth street, when on a voyage from Nassau to St. Pierre. He himself undertook to make this explanation, inquiring of the officers who came aboard how he could get to the custom house, where he voluntarily went the next day. In a court of admiralty, his statements then made should not be excluded from the consideration of the court, in its endeavor to arrive at the truth. He was available as a witness, could have been called to explain or qualify his admissions, and the claimant could have contradicted what he had said, or shown its falsity by the testimony of others, if in fact it was not true.
Giving due weight to unavoidable inferences from admitted circumstances, the following facts appear from Hadley's admissions, and the record of proceedings in the Supreme Court of the Bahama Islands: Hadley, the master, had previously brought into the port of New York and landed at the foot of West Thirtieth street a large quantity of intoxicating liquors for one Fay, whose business he described as "the bootlegging business." In this business Fay had used the schooner W. Talbot Dodge, libeled in this proceeding. Hadley, in partnership with one Edward Manchester, arranged to purchase the Dodge, which was then lying at Norfolk. Their plan was to take the schooner to Nassau, and bring back to New York a cargo of intoxicating liquors, which Fay agreed to dispose of for a consideration to be paid to him of $5,000. This $5,000 was to be paid to Fay for "protection," and in this connection Fay told Hadley, "I want $5,000, and leave it to me, and I will get rid of it for you," referring, of course, to the cargo of liquor which was to be brought into New York. Hadley and Manchester, having purchased the ship from Fay, engaged a crew and dispatched her from Norfolk to Nassau. They then proceeded to Nassau themselves, where they also met Fay, to arrange for the purchase of the cargo, and incidentally for the transfer of the ship to British registry.
This transfer, it appears, they accomplished in the following manner: One Allan Harcourt Kelly, the present claimant herein, was procured to file a libel against the ship shortly after her arrival at Nassau, *461 alleging a claim of $1,200 for necessaries supplied to the ship, and for money payable to the plaintiff, for money lent and advanced by the plaintiff, and for money paid at the request of the defendant. Manchester immediately appeared as owner, consented to a decree, and requested an early sale. Upon the sale Kelly was the purchaser, and, being a British subject, he promptly procured registry of the ship under British law. This entire proceeding was collusive and fraudulent, in the sense that there was no claim or lien against the ship as alleged in the libel. The court was deceived, and the collusive proceedings were gone through with for the sole purpose of obtaining British registry. Kelly had no interest in the vessel before or after the sale. He acted only as a dummy at the request of Hadley and Manchester, and at their request procured a false registration and a false clearance.
The cargo of liquor was loaded at Nassau, and the ship cleared, as stated, for St. Pierre; Hadley acting as master. There was no intention on anybody's part that the ship should proceed to St. Pierre. Hadley, Manchester, and Fay were the only persons interested in the ship or her cargo, and they all planned and intended that the liquor should be landed in New York City, and that Fay should then dispose of it by sale, as he had promised to do. The admissions of Hadley, from which these facts appear, either expressly or by necessary inference from facts which he did admit, are uncontradicted and unexplained. They find strong corroboration in the surrounding circumstances, and it is quite absurd to suppose that the claimant, Kelly, if he had any real interest in the vessel or her cargo, could have failed to offer some proof that he obtained title in good faith, and that the decree was not a fraud and a deceit upon the court which rendered it.
The libelant in both of these cases filed exceptions to the claimant's claim. The hearing upon these exceptions having been reserved for the trial, the question which arises upon the very threshold of this case is whether the claimant has any interest in the ship or her cargo. The formal record of the admiralty proceedings in the Supreme Court of the Bahama Islands and of the subsequent registry of the vessel under British law prima facie sustain the claimant's title to the ship. This paper basis for Kelly's claim was created in fraud, extrinsic of the court record, and practiced upon the court in order to create a false appearance of ownership, and the question here is whether this court must now recognize Kelly as the rightful owner of the ship, entitled to file a claim in these proceedings brought by the United States for her forfeiture, and to litigate such questions as may arise. The answer to that question depends upon what, if any, effect must be given to the decree in the admiralty proceedings before the Supreme Court of the Bahama Islands.
Although the general rule is that an in rem decree of a foreign court in admiralty, having jurisdiction, is binding and conclusive upon all persons and in all countries, and cannot be disregarded or contradicted in any subsequent proceedings (The Fortitude [Williams v. Armroyd] 7 Cranch, 423, 3 L. Ed. 392), even such a decree of a foreign court is open to collateral attack by a stranger to the record in the courts of this country and of England, if it can be shown that fraud was practiced on the court in obtaining it. Bradstreet et al. v. Neptune Ins. Co., 3 Sumn. 600, Fed. Cas. No. 1793. In that case Justice Story, considering the effect of a decree of condemnation against a vessel seized by the Mexican authorities and condemned by a Mexican court for a violation of the revenue laws of Mexico, said:
"But, if the defense be that the proceedings were not merely irregular and illegal, but were founded in a positive fraud, and that in point of fact the whole record was but a tissue of false accusations and false statements and false proofs, made up to cover the fraud in which the seizing and prosecuting parties were all confederated, I should think that evidence was admissible to show that the master never was summoned, never did appear, and never was heard before the condemnation, in order to establish pro tanto the fraud. I know of no case where fraud, if established by competent proofs, is not sufficient to overthrow any judgment or decree, however solemn may be its form and promulgation."
The decision of the House of Lords of England upon the trial of the Duchess of Kingston for bigamy is to the same effect. There the question was whether a decree of the ecclesiastical court against a marriage, conceded to be conclusive evidence, so as to prevent the crown from proving the marriage upon an indictment for polygamy, could be voided upon such a trial by proving the same to have been obtained by fraud or collusion. Lord Chief Justice Sir William de Grey, delivered the opinion of the judges, which was adopted by the House of Lords, holding that such a decree could thus be voided. He said:
"But if it was a direct and decisive sentence *462 upon the point, and, as it stands, to be admitted as conclusive evidence upon the court, and not to be impeached from within; yet, like all other acts of the highest judicial authority, it is impeachable from without; although it is not permitted to show that the court was mistaken, it may be shown that they were misled. Fraud is an extrinsic, collateral act; which vitiates the most solemn proceedings of courts of justice. Lord Coke says, it avoids all judicial acts, ecclesiastical or temporal." The Duchess of Kingston Case, 20 Howell's State Trials, 537, 543, 2 Smith's Lead. Cases, 731, 738.
Subsequent English authorities concur in holding that any foreign judgment, whether in rem or in personam, may be impeached upon the ground that it was fraudulently obtained. See Hilton v. Guyot, 159 U. S. 113, 286, 16 S. Ct. 139, 40 L. Ed. 95, where these decisions of the English courts are cited.
The proceedings here relied upon to sustain the right to claim the property sought to be forfeited were fictitious, in the sense that, while it was made to appear to the court that they were adversary proceedings for the enforcement of a just lien against the ship, in truth there was no lien, nor any dispute between the parties, who came to court, not to settle rights or liabilities, but in collusion, to create the appearance of rights which had no existence. Similar proceedings were considered in Lord v. Veazie, 8 How. 251, 12 L. Ed. 1067, where it was held that such proceedings were highly reprehensible and in contempt of court, and that a judgment entered in such a case was a mere form, a nullity, and void, and that no writ of error would lie upon it.
Undoubtedly a stranger, who undertakes to impeach a judgment for fraud or collusion, must show that, if the judgment is recognized and enforced, he will in some way be prejudiced in his rights. Michaels v. Post, 21 Wall. 398, 22 L. Ed. 520. Where the rights of the sovereign in the enforcement of penalties and the prosecution of crime are involved, the interest which may be prejudiced by giving effect to a collusive and fraudulent judgment is never a pre-existing property right. The right which is prejudiced in such a case is that the enforcement of the penalty or the prosecution of the crime shall not be hindered, delayed, or defeated by the assertion of a collusive and fraudulent decree, obtained through deception practiced upon the court which rendered it. The sovereign interest of the United States, asserted in this proceeding for the condemnation of the vessel and her cargo, is quite sufficient to justify the admission of evidence to show that the decree upon which the claimant's title alone depends was procured by fraud and deceit, extrinsic of the record, and thus to avoid the effect of that decree.
In view of the rule stated in the Duchess of Kingston's Case, supra, and by Mr. Justice Story in Bradstreet et al. v. Neptune Ins. Co., supra, and in the absence of any authorities cited to the contrary, I am constrained to hold that the decree of the Supreme Court of the Bahama Islands and the pretended sale thereunder is void and of no effect, by reason of the fraud and deception practiced upon the court. It follows that the exceptions to the claim must be sustained upon the proofs at the trial.
No other claims having been filed herein, condemnation of forfeiture must follow pro confesso upon the allegations of the libels, provided these allegations are sufficient. Miller v. U. S., 11 Wall. 268, 301, 20 L. Ed. 135, 303, 20 L. Ed. 135; The Ruth E. Merrill (C. C. A.) 286 F. 355, 356; The Water Witch (C. C.) 44 F. 95; The Lopez (D. C.) 43 F. 95. Without examining all the alleged causes of forfeiture in each libel, it will suffice to say that the third cause of forfeiture alleged in the libel against the ship is sufficient to warrant condemnation, and that the first cause of forfeiture alleged in the libel against the cargo is sufficient to warrant condemnation. No opinion is expressed in regard to the sufficiency of any of the other causes of forfeiture alleged.