## THE FLORENCE A.
## THE SAN JULIAN.

### No. 1763.

District Court, D. Maryland.

Dec. 16, 1930.

Lord & Whip, of Baltimore, Md., for libelant.

MacFarland, Taylor & Costello, of New York City, and George Forbes, of Baltimore, Md., for defendant.

SOPER, District Judge.

█ The facts in this case are relatively simple. There is, of course, the usual divergence of testimony found in such cases, originating, in part, from the conflicting interests of the parties, and in part from the inherent difficulty of estimating distances and speeds of moving vessels on the water. The outstanding fact is that a sailing vessel was run down by a steamer; and on that account one must examine with care the seamanship or navigation of the steamer, which is under the burden of keeping out of the way of the sailing vessel under the navigation rules. Indeed, some of the courts go so far as to

say that there is a presumption in such a case which the steamer must overcome. Certainly it is true that article 20 of the Pilot Rules (33 USCA § 205) provides that, when a steam vessel and a sailing vessel are proceeding in such directions as to involve risk of collision, the steam vessel shall keep out of the way of the sailing vessel; and article 23 of the same rules (33 USCA § 208) provides that every steam vessel which is directed by the rules to keep out of the way of another vessel shall, on approaching her, if necessary, slacken her speed or stop or reverse. It is the opinion of the court that in this case the steamer did not properly observe these rules, and that as a result of her failure the collision took place.

The facts have been fully presented and fully argued, and the reasons which have moved the court to reach the result announced may be briefly stated. It is conceded in the case that the collision took place about 2 o'clock P. M. on December 29, 1929, about the center, or a little east of the center, of the Cut-Off channel, approaching Baltimore. The schooner was bound from Virginia to Baltimore with a load of lumber on the deck, having stopped at Annapolis overnight to wait for clear weather. At the time of the collision the weather was clear, and the wind about 20 miles an hour from the north, northwest, or in that general quarter. In order to reach Baltimore after the lower end of the Cut-Off channel was reached by the schooner, it was necessary for her to tack. It may be well to state at this point that she was a two masted schooner 96 feet 5 inches in length, 27 feet 4 inches beam, with a depth of hold of 7 feet 2 inches. The steamer was some 488 feet long.

As the schooner proceeded up the river before she reached the Cut-Off channel, she was making 5 miles an hour, but later, when she had to beat her way, she was making about 2½ miles an hour. The steamer coming up the river after the schooner was making something over 10 miles or ten knots an hour. It was obvious to the men on the steamer that the schooner was obliged to tack back and forth in order to reach the city. They saw her make one tack, which, according to the testimony of the navigators of the steamship, began one-quarter of a mile westerly of the channel, and then went diagonally across the channel to a point on the other side, perhaps 150 feet east of the channel. And it is in effect admitted in the case that the navigators of the steamer were aware that

the schooner was engaged in beating its way, as described.

Now the evidence on the part of the schooner is that having reached a point eastwardly of the channel, somewhere in the neighborhood of red buoy 6–K, and 1,000 or 2,000 feet from the Seven-Foot knoll, her master was afraid to proceed any further on account of what he called the lumpy nature of the bottom, so he came about in order to make a starboard tack westwardly across the channel. At this point, the wind being as indicated, he ordered the men on his boat to lower the foresail, and that was done. The boat came about, and he proceeded to cross the channel.

According to his testimony, he had seen the steamer some distance down the river on his previous tack, and he also saw her when he came about for his final tack, and then judged that she was a mile away, and that there was ample time for him to cross the channel without colliding with her. He testifies, and his witnesses also testify, that it took fifteen minutes from the time that he arrived at the point eastwardly of the channel and made up his mind to come about until he reached the middle of the channel; and he seeks to draw the inference that during this interval there was plenty of time for the steamer to have taken suitable action to avoid him. This testimony is corroborated to some extent by the assistant keeper of the Seven-Foot Knoll lighthouse. It is a difficult matter to estimate the exact duration of time, and the court could hardly decide that the schooner should recover if it were obliged to reach the conclusion that fifteen minutes were consumed in the maneuver described. It took some appreciable length of time, doubtless. Two and a half miles per hour, which was the best the schooner could make while beating its way up the channel, was certainly much more than the schooner made from the time that she came up into the wind preliminary to coming about and the time of the collision. It goes without saying that there was considerable slowing up of the headway of the vessel and considerable time lost before she gained her full headway again. But it is likely that the estimate of fifteen minutes is too great.

In speaking of the testimony of the schooner's captain, some comment should be made upon the reason for coming about at this particular time. This action on the part of the schooner has been vehemently assailed by counsel for the steamer as absolutely un-

necessary and unreasonable. It does not seem to the court to be so. There is testimony, not only on the part of the captain, but also of the lighthouse keeper, that the bottom was not altogether safe. But, even if this were not a sufficient reason for coming about, the obvious desire and right to reach his port of destination suggested to the captain that he should make a tack at this time. Even if we believe, as counsel for the steamer argues, that there was nothing the matter with the depth of water, and that the schooner could easily have gone further on its port tack to the eastward, nevertheless it was entirely reasonable, so far as one can tell from the testimony, for her to make a change of course at this time. It was a part of the business of negotiating the channel.

On the other hand, the authorities which have been cited here, especially those on behalf of the steamship, indicate that a schooner in such situation as this may not unreasonably and unexpectedly shift her course to the obvious endangering of her own safety and that of a steam vessel proceeding in the same general direction. If the testimony in this case should indicate that, when the schooner came about, there was not then time for the steamer to have stopped or to have diminished her speed so as to avoid collision, the cases which have been cited would be much more pertinent, and would go a long way to sustain the contention that the schooner should be held in fault. But the view that the court takes of the testimony on that point is that at the very moment when it should have been apparent to the navigators of the steamer that the vessel was coming about to take the starboard tack to the westward there was then time to have diminished the speed of the steamer and to have avoided the collision.

Here we have, of course, differences in testimony between the two sides of the case. The navigator of the schooner says that when he came about the steamer was a mile away. Some of the witnesses for the respondent have given testimony tending to show that when the schooner came about the steamer was only 1,000 feet away. The opinion and conclusion of the court is that neither estimate is correct, but that something in between the two is correct. And on this very point, if we take the testimony of two eyewitnesses for the respondent, who were on the ship, and witnessed the maneuver of the schooner, we find that the ship was far enough away when she knew, or should have known, that the schooner was coming about,

to have avoided the collision. The witnesses referred to are the second officer and the chief engineer. They were both on deck, and they both say that, when the schooner came into the wind, which was the first thing she had to do in making the maneuver to change her course, the steamship was approximately a half a mile away. It is true that there is considerable unanimity of statement that the sailing vessel was only 1,000 feet away when the steamer slackened her speed, and that she did stop and reverse her engines and give some blasts of the whistle as soon as it was realized that the schooner was going on her starboard tack. But the testimony shows with equal clearness that the officers of the steamship and her pilot did not very clearly understand the management of a sailing vessel, and that they were misled, not by any surprising tactics on her part, but by their own inability to understand what she was about.

There is some excuse for the apparently conflicting estimates made by the second mate, who fixes the distance at 1,000 feet at one time and a half mile at another. He is speaking of two different points of time. When he says that the vessels were a half mile apart, he is referring to that point in the schooner's course when she came up into the wind, before she let down her foresail and before she came about. When he is speaking of the thousand feet distance, he has in mind that point in the schooner's course when the navigators of the steamer finally realized that she was setting out on her starboard tack. This conclusion is supported by their testimony that they thought that the schooner was going to anchor. The reason why they thought she was going to anchor was that she had crossed the eastern boundary of the channel, and let down her foresail when she came up into the wind. They thought that she was going to let down all her sails and anchor. But the foresail was let down because the captain of the schooner deemed it was good seamanship in this wind to shorten sail. The uncontradicted testimony from the mouths of the navigators of the steamer themselves is that they did not know much about sailing boats; and, in addition, there is the uncontradicted testimony that, when a sailing boat is about to anchor, she lets down her jibs first. The element of surprise, therefore, which undoubtedly affected the navigation of the steamer, sprang, in the opinion of the court, not from the extraordinary action of the schooner, but from

their own lack of experience and knowledge of sailing vessels.

It will be recalled that the collision took place at the middle of the channel, or, perhaps, 100 or 150 feet east of the center line of the channel, and that at that time the schooner was across the channel, not exactly at right angles, but pretty well across the path of the approaching steamer, and that the bow of the steamer came in contact with the port quarter, very near to the stern of the schooner. A very small fraction of time would have permitted the steamer to have passed under the stern of the schooner safely, as she was endeavoring to do. This circumstance convinces the court that, had the navigators of the steamer realized as soon as the schooner went into the wind that she was about to go on another tack, and if they had then taken the action which they took later, to check the speed of the steamer, the accident would have been avoided. It is the view of the court that there was time for the schooner to cross from the eastern to the western side of the channel on the starboard tack, and that, when the captain looked back and saw the steamer at least a half mile away, he had reason to believe that she would so navigate as to avoid a collision.

The cases that have been cited by respondent differ from the case at bar in the fact that the final maneuver of the sailing vessel in those cases was taken so short a time before the collision that it was unavoidable despite anything that the steam vessel could do. The cases particularly relied on are The Harrisburg (D. C.) 71 F. 894; The Philadelphia (C. C. A.) 61 F. 862; The Illinois, 103 U. S. 298, 26 L. Ed. 562; Jacobsen v. Dalles, P. & A. Nav. Co. (C. C. A.) 114 F. 705; Publicover v. Massey (C. C. A.) 23 F.(2d) 584; and The Potomac, 8 Wall. 590, 19 L. Ed. 511. In the case of The Illinois, for instance, a sudden change in the course of the sailing vessel took place when the steamer was approximately only 1,000 feet away. There was not anything from the steamer's viewpoint to indicate to her the necessity for an early changing of the course for the schooner, and the schooner unnecessarily threw herself in the way of the approaching steamer, without any examination or lookout.

So also in Publicover v. Massey, supra, the statement of facts shows that everything was going along well; the steamer, if she kept her course, and the schooner, if she kept her course, would have avoided one another; but suddenly the wind gave out, and that left the schooner becalmed in front of the approaching steamer, when she could not prevent the collision by any action on her part.

Such circumstances distinguish the cited cases. It cannot be said in the case at bar that there was nothing in the view of the steamer to indicate to her the necessity for a change of her course. While she may have thought that the schooner could have gone further to the eastwardly, she was advised by the eyes of her navigators that the schooner had decided not to go further in that direction, but was about to take a tack to westwardly. In short, there was then brought home to the steamer the necessity for taking prompt action in view of what she knew, or should have known, that the schooner was going to do, but such action was delayed until too late.

The case of Coe F. Young (D. C.) 45 F. 505; Id. (C. C. A.) 49 F. 167, which concerned a schooner tacking back and forth across the river ahead of a following steamer, involved facts much nearer to those of the case at bar than the cases cited by the respondent.

In what has already been said, the court has made no comment upon the fact that, after the collision took place, the steamer proceeded to Baltimore and did not stop to aid the stricken schooner. This circumstance, of course, did not in any way contribute to the accident. But it may fairly be considered as bearing upon the manner in which the steamship was navigated. There is strong testimony tending to show that it would not have been safe for the steamer to have anchored in the channel at that time. The court is willing to accept that explanation of her failure to stop completely, but the court is convinced on the testimony before it, including that of the second officer of the ship, that it would have been possible to have launched a boat from the steamer and gone to the rescue of the men who were on a vessel that was kept afloat only by reason of her deckload of lumber. It savored of inhumanity to let the men on the schooner shift for themselves, as they had to do for some two hours before rescue came; and this circumstance indicates a certain indifference to the rights of a sailing vessel on the part of the navigators of the steamer which is not inconsistent with their statements that they did not know much about sailing boats. In fairness to the navigators of the steamer, it should be added that they knew that the schooner would not sink because of her deckload, and that during the

progress of the steamer up the river they sent a radio message to the Coast Guard, notifying them of the plight in which the schooner was, and later when in port made some further effort to send relief to the schooner.

The court finds that the steamer was responsible for the accident, and the libelant is therefore entitled to a decree.