**THE INDEPENDENT.**

No. 122.

District Court, E. D. Louisiana, New Orleans Division.

Feb. 11, 1941.

John D., M. A., & Edwin H. Grace, of New Orleans, La., for plaintiff.

Spencer, Phelps, Dunbar & Marks, of Dunbar, La., for defendant.

CAILLOUET, District Judge.

The New Orleans Coal & Bisso Towboat Company, represented by its president, W. A. Bisso, made a verbal agreement, over the telephone, with the Texas Company, libellant herein, "to furnish some barges to move some oil" in the Mississippi River from the libellant's plant at Marrero, Louisiana (which lies on the opposite river bank from the City of New Orleans), to the plant of the Lone Star Cement Company, in the Industrial Canal; such agreement followed his having been first asked by the representative of the libellant "to arrange to handle 5,000 barrels of oil from the plant to the Cement plant." (Bisso, pp. 64, 79.)

The libellant was advised by the witness as to the capacity of the two barges agreed to be furnished,—that one carried "about 2,000 barrels" and the other "practically 3,500"; but that, as to the latter, the witness "only wanted to put about 3,000 barrels in it." (Bisso, p. 81.)

Upon being cross-examined as to whether or not the agreement at first contemplated the furnishing of two barges or "one large barge", the witness answered: "It might have been we were to furnish one large barge, and for some reason or other we didn't have the barge here because it might have been chartered to some one else and they didn't return it, and when the time came to make the delivery, not having the other barge it is evident we must have agreed to handle the two barges". (Bisso, p. 80.)

The two barges were actually furnished and were brought over to the loading wharf or dock of the Texas Company by the claimant's tug, the Independent, on January 4th, 1932, and in the early morning of January 5th the same tug came back to move the oil in question from libellant's plant to that of the Lone Star Cement Company: libellant's oil, 1,904.88 barrels in Barge 12, and 3,238.29 barrels in Barge 18 (sometimes erroneously referred to as "15", in the testimony), or an aggregate of 5,143.17 barrels of an alleged total value of $2,299.62, when then and there in the custody of the claimant and respondent, and in the process of being moved in compliance with the agreement existing be-

tween it and the libellant, was lost under the circumstances hereinafter detailed.

The present libel followed on September 19, 1933, against the tug Independent, and respondent and claimant, through its said president, W. A. Bisso, intervened on December 27, 1933, and laying claim to the tug, as owner, prayed to defend; the tug having been previously released under bond.

On the same day exceptions to the libel were filed, and these were disposed of in due time.

On January 10, 1934, and again on December 27, 1934, the libel was amended and supplemented.

Answer was then filed on March 12, 1935, and an amended and supplemental answer, on December 13, 1937; on each occasion laches was pleaded against libellant.

On May 28, 1940, claimant and respondent filed its second amended and supplemental answer.

The respondent's contention is that Barges 12 and 18 were leased by it to the Texas Company, which loaded them with its oil, and that, under a contract of towage between the parties, the tug Independent took them in tow; whereupon (so respondent and claimant alleges), although both barges were entirely seaworthy and fit for the transportation of oil, and although nothing that it did caused the disaster, Barge 12 sank and Barge 18 listed so badly that it had to be beached. Which disaster, so far as libellant was concerned, resulted, it may here be said, in the complete loss of the oil cargo, and recovery is sought for its declared value of $2,299.62, with interest thereon from January 4th, 1932, and costs.

Libellant's position is that there was but one contract between it and the respondent claimant, or that is to say, a contract of affreightment, and that the barges furnished for the transportation of its oil by the equipment of the respondent claimant, which constituted said barges and the tug Independent, were unseaworthy and unfit for the transportation of the oil in question under the conditions obtaining in the Mississippi River on the morning of January 5, 1932, but which were in no wise extraordinary nor such as might not have been reasonably anticipated.

The evidence establishes that the barges were taken in custody by the tug, at the loading dock or wharf of the Texas Company, on a rising river, with a swift current running. (Downin, p. 12; Ennis, p. 36; Bisso, p. 70, 96, all witnesses called upon behalf of the respondent-claimant.)

Captain Bisso, respondent's president and authorized representative with respect to this particular transaction with libellant, testified as follows concerning the river stage, the current, the wind, the water surface, etc., viz.:

"Q. You know, do you not, Captain, from being out on the river as you say you were that morning immediately after #12 sank, that they had a very strong current in the river, don't you? A. The river was high; quite a little current.

"Q. What about the wind; do you recall? A. There was a little wind; and that reach is a long reach, about three or four miles, and the least little wind against the current would cause a little wave.

"Q. It was a choppy condition of the river, was it not? A. In that reach it might have been a little rough; I don't know how rough; it wasn't smooth; the least little wind will make—" (Bisso, pp. 95, 96.)

Previously, by way of explanation why no attempt was made to raise the sunken barge #12, from January 5, 1932 (the day of the disaster), until the month of September, he had testified: "The current was so strong, and it's deeper right there, just on the outside edge of the mooring barge of The Texas Oil Company's wharf, and a bend in the river there, and the current is very strong, * * *." (Bisso, p. 70.)

Captain Bisso further testified that neither of the barges were constructed with a water tight center line bulkhead. Between the top and bottom of this particular bulkhead, and the deck and flooring of the barges, respectively, there were open spaces of 4 to 6 inches, which permitted a liquid cargo to shift from side to side. The Barges 12 and 18 were not suitable for the handling of heavy oil, such as formed the cargo of Barges 12 and 18 at the time, whilst a cargo of lighter oil in just such barges as Nos. 12 and 18 would shift in the face of a side current, with a resultant list of so much as to bring one side of the barge two or three feet out of the water, nevertheless there was no sinking but a prompt righting of the vessel so soon as the current changed. A cargo of heavy molasses, un-

der similar circumstances, invariably sank the barge.

These facts were well known to the witness because of his previous experience in the barge transportation of oil and molasses. (Bisso, pp. 97, 98, 99.)

The evidence shows that the Barge 18 had seen prior like service in the interest of the Texas Company, and had been loaded from the same dock or wharf. (Bisso, pp. 102, 103.) Former loadings, though of even heavier oil, in 6 out of 7 times, than the oil lost in the disaster of January 5, 1932, had been not as large as the one of January 4, 1932. (Schneider Exhibits 1, 2, 3.)

Whilst the witness Bisso testified that when the representative of the Texas Company asked him "to arrange to handle 5,000 barrels of oil from the plant to the Cement plant", he (Bisso) had in mind "the handling of bunker oil, or the same kind of oil we have handled for other companies for the ships" (Bisso, pp. 79, 80), there is no contention made that the libellant's representative was informed of this, nor is there evidence in the record to establish that the oil lost was any different than the libellant's oil previously handled for it by respondent-claimant (Schneider Exhibit 3) from the self-same loading dock or wharf. Captain Bisso, it is true, would not, at first, admit that the former loading of libellant's other oil in Barge 18 could have been of "ship oil" (as is reflected by said Schneider Exhibit 3), but did concede that such heavy oil, when heated, is "practically the same weight as the other or the bunker oil". (Bisso, p. 103.) It is assumed that, under such circumstances, it was "ship oil", or satisfactory for fuel use on ships.

Captain J. W. Tyler, master of the tug Independent, and now dead since October 1, 1936, swore to his official report of the mishap of January 5, 1932, before Nat W. Bond, then notary public in and for the Parish of Orleans, Louisiana, and now one of the Judges of its Civil District Court, on February 24, 1932, and by said report it appears that he had barely begun to swing the two barges "head down the river" from the libellant's loading dock (they having theretofore been tied to said dock "head up") when, in the heavy seas", the barges "started listing to port, and the strong current and heavy sea caused by a strong wind blowing upstream caused the

barges to roll more" and they "continued listing heavy to port."

The report continues to the effect that Barge 12 sank in front of libellant's dock whilst Barge 18, which never wholly submerged, was finally beached by him about 1,000 feet below the wharf. He then recites that at the time of so making such official sworn report, Barge 12 had not yet been located "on account of the extreme high water and swift current in the river, which was running over five miles per hour" and, finally, that both barges held an underwriter's certificate for carrying oil, and were "in first class condition."

Whilst defendant's counsel objected to the admission in evidence of this sworn master's report, there is no doubt that it is an authentic official report; defendant's own witness, Captain W. A. Bisso, having identified as true and genuine the two signatures thereto appended as those of Captain Tyler, the master, and Notary Bond, respectively. (Bisso, p. 87.)

That the report was made and intended by the master of the tug Independent as an official report of the occurrence which is now under investigation, and that he swore to said report and signed the same before the notary, is satisfactorily established.

Objection was also made to the admission in evidence of the certified copy of the official record of the testimony given by Captain Tyler, as master aforesaid, before the local inspectors of the Department of Commerce's Bureau of Navigation and Steamboat Inspection and, particularly, to certain excerpts from said official record of his testimony, wherein appears (amongst others) the following questions and answers, viz:

"Q. You were master of the tug Independent when she was handling the barges that turned over? A. I was.

"Q. That was barge #12 and #18? A. Yes, sir. * * *

"Q. What were you doing with them? A. We were fixing to take them down to the Lone Star Cement plant in the Industrial Canal; they were loaded with oil; we went alongside of the barges at six o'clock and started to leave at six-thirty.

"Q. Were you going to take them both at once? A. Both at once. #18

was on the port side of the tug, hitched up, and #12 was on the starboard side of the tug; the tug was in between the two barges.

"Q. You let go from the dock and started out? A. We let the head lines go and came ahead slowly and turned the barges around head down the river, and when we got about fifty feet from the dock and swift current and the wind blowing hard upstream, the barges took a list to port and #12 turned over within fifty feet from the Texas Oil Company's dock. * * *

"A. #18 was on the port side.

"Q. What happened to her, anything? A. After #12 had turned over and sank, why we started to drift; I started to work into the bank to try to tie her back up to #12 and before I could get her into the wharf, she turned over.

"Q. What happened to them? You didn't have much way on them. How much way did you have? A. No way at all. The current took them around. * * *.

"Q. How deep were they loaded? A. About one and a half feet out of the water.

"Q. You think they had that much at the lowest place? A. About eighteen inches. * * *

"Q. When you left the dock at Marrero, you started to turn to starboard? A. Yes, sir.

"Q. When you got the barges out in the current the barges rolled over? A. Yes, the current hit the port bow—the port quarter, rather—of the barges, and the wind was blowing hard up the river; the barges got in a trough of the sea and they took a list. * * *

"Q. What were the engines of the tug doing when the barges turned over? A. It was stopped.

"Q. When she started you stopped her? A. When we started away from the landing I came ahead, slow ahead, hard aport wheel. I started the tow out in the river to swing and then I stopped the tug to give them a chance to swing around.

"Q. Where they were tied up, is that slack water? A. No, sir; straight current there. * * *". (Libellant's Exhibit No. 7, pp. 1–4.)

The declarations of the master with reference to the occurrence of January 5th, 1932, under investigation, so made under the circumstances evidenced by his sworn report and by his appearance and testimony before the local inspectors, were all admissible in evidence inasmuch as Captain Tyler, master of the marine equipment engaged in the transportation of the oil cargo which was lost in the disaster, must be considered, in admiralty, as the owner pro hac vice of such equipment. The Potomac, 1870, 75 U.S. 590, 8 Wall. 590, 19 L.Ed. 511; The W. Talbot Dodge, D.C.S.D. New York 1926, 15 F.2d 459; The T. J. Hooper, D.C.S.D. New York 1931, 53 F.2d 107; The Abangarez, D.C.E.D.La.1932, 60 F.2d 543.

The evidence is clear that neither one of the Barges 12 and 18 was overloaded. It has already been shown by reference to the Bisso testimony that Barge 12 ordinarily carried "about 2,000 barrels", whilst No. 18 carried "practically 3,500", although the witness (Bisso) only wanted to put about 3,000 barrels in it.

The loaded Barge No. 12 had about 15 inches freeboard next immediately preceding the moment of disaster, and No. 18, about 12 to 13 inches; so testified respondent's employee, George Downin, who said that he had already been on the barges when they were loaded "deeper" than on this occasion. (Downin, p. 16.)

The barges were loaded no different than had been customary, and they had 16 to 18 inches freeboard, another of respondent's employees testified. (Ennis, p. 39.)

Captain Bisso, himself, was of the opinion that 10 to 12 inches "is plenty freeboard". He testified, in fact, "We have had them down right to the nose, which is to say only about 6 or 8 inches from the deck." (Bisso, p. 102.)

C. W. Moore, inspector for the Board of Underwriters, which is, he says, an inspection bureau for such marine insurance companies of New Orleans as compose that Board, was also called to the stand by respondent and testified that six inches freeboard was insisted upon by the Board—it may have been 1 foot at the time of the disaster—but that, at any rate, 12 inches freeboard as to Barges 12 and 18 in inland waters, afforded an ample margin of safety. This same witness asserted that the capacity of Barge 12 was 400 tons and that Barge 18 could carry a 500-ton deck cargo and "a capacity cargo of bulk oil in the hold". (Moore, pp. 117, 123, 127, 129.)

The oil cargo on Barge 12 at the time of the disaster was less than 350 tons, and that on Barge 18 was approximately 585 tons, but in view of its freeboard, Barge 18 did not carry a "capacity cargo of bulk oil in the hold". (Schneider Exhibit 3.)

From the testimony of three witnesses called on behalf of the respondent, and all in its employ, it appears that the sinking of Barge 12 and the heavy listing and subsequent maneuvering of Barge 18 until its beaching occurred under different circumstances than those detailed by the master. (Downin, pp. 5, 16, 17; Ennis, pp. 28, 31, 33, 34; Williams, pp. 40, 43, 45, 46.)

Their testimony, however, clearly establishes that when the first line which ran from the stern of Barge 12 to the loading dock was detached by Downin upon orders from the master, the said barge began to list; and that, in spite of said list, the second line, which ran from the bow, was similarly ordered untied; whereupon, the listing increasing, the barge sank out of sight. Five to ten minutes after such sinking, the master ordered the untying of the lines from Barge 18 to the dock, and as soon as this command was obeyed as to the first of said lines, the barge, after first listing badly to port, then drifted with the current side up or on edge, and having 8 or 10 feet projecting out of the water. (Bisso, p. 73.)

A reading of all of the testimony adduced on behalf of the respondent, as well as that of Lawrence J. Schneider, foreman of the libellant's plant at Marrero, justifies the following findings of fact, viz.:

### Findings of Fact.

1. Respondent had contracted with libellant for the transportation and delivery of a cargo of fuel oil from libellant's plant on the Mississippi River to that of the Lone Star Cement Company on the Industrial Canal.

2. Libellant's cargo of fuel oil, whilst then and there in custody of respondent and in the process of transportation under such contract, was lost by the foundering of the two barges furnished by respondent as part of its marine equipment for so carrying out said contract. Such cargo was made up of 5,110.25 barrels, or 214,631 gallons, of 4.4 gravity (at 60° F) fuel oil C.

3. The barges in question were unseaworthy for the transportation of fuel oil of that gravity in the Mississippi River, under the attendant conditions of current, wind and choppy water surface such as prevailed on the morning of the disaster, but which were nothing unusual and no more than might reasonably have been anticipated by respondent's President and managing officer, W. A. Bisso, who was, admittedly, a skilled seaman and was entirely conversant with the river conditions at this point, he being also president of the ferry company operating the Napoleon Avenue ferry, which lands at Marrero, no more than 200 feet above the loading dock or wharf of the libellant. (Bisso, p. 67.)

The Court's conclusions of law are the following, viz.:

### Conclusions of Law.

1. A contract of affreightment, and nothing else, was entered into between the libellant and the respondent, the same having for its object the transportation and delivery of libellant's fuel oil from its plant to that of the purchaser of said oil. A contract to transport goods constitutes a contract of affreightment, although there is a towage service connected therewith. Sacramento Navigation Company v. Salz, 1927, 273 U.S. 326, 47 S.Ct. 368, 71 L.Ed. 663.

2. The legal burden rested on respondent to establish the seaworthiness—specially for the transportation of libellant's fuel oil—of each one of the three items of marine equipment constituting the medium of the marine transportation contemplated by the contract. The Harter Act, 46 U.S.C.A. §§ 190–195; Benedict on Admiralty, Knauth, vol. 1, § 95, p. 288, note 19; International Navigation Co. v. Farr & Bailey Mfg. Co., 1901, 181 U.S. 218, 21 S.Ct. 591; 45 L.Ed. 830; Martin et al. v. SS Southwark, 1903, 191 U.S. 1, 24 S.Ct. 1, 6, 48 L.Ed. 65; The R. Lenahan, Jr., 2 Cir., 1931, 48 F.2d 110; The Fred Smartley, Jr., 4 Cir., 1939, 100 F.2d 971.

3. Respondent's defense of laches is not maintainable; the delays complained of have not brought about a situation where this Court is prevented from doing justice between the parties, nor has respondent been induced to alter its position; the existence of laches depends on the equities of the case and not merely on the lapse of time. Benedict on Admiralty, Knauth, vol. 3, §§ 462, 464, pp. 290, 293; 2 C.J.S., Admiralty, § 87, p. 171; United States v. Alex Dussel Iron Works, Inc., 5 Cir., 1929, 31 F.2d 535.

In view of the foregoing, a decree shall be rendered in favor of the libelant, the Texas Company, and against the tug Independent, for the full value of the oil cargo thus lost in the disaster of January 5th, 1932, with costs, but without interest except from the date that the case was closed, i. e., May 28th, 1940; subject to the right and privilege of the parties to mutually agree within five (5) days from this date, under written stipulation, as to the amount of value involved in the loss, and for which such decree should be rendered; failing the filing in the record of such a stipulation, the matter is referred to Reginald H. Carter, Sr., for the specific and only purpose of ascertaining the damages suffered by libellant, and he is hereby appointed Commissioner for the purpose of ascertaining such damages; and he shall, immediately following the expiration of the said five-day period, proceed to act under this appointment, ascertain such damages, and thereupon promptly report his findings to the Court.